Michael J. Elmore #7-5665
Assistant United States Attorney
District of Wyoming
P.O. Box 449
Lander, WY  82520
(307) 332-8195
michael.elmore@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | |
| **v.** | **Criminal No. 22-CR-60-F** |
| **RONALD OSTROM,** | |
| Defendant. | |

---

**GOVERNMENT'S NOTICE OF INTENT TO OFFER INEXTRICABLY INTERTWINED EVIDENCE OR IN THE ALTERNATIVE, NOTICE OF INTENT TO OFFER RULE 404(b) EVIDENCE**

---

The United States gives notice of its intent to offer evidence of other acts by the Defendant. The United States believes these acts are inextricably intertwined with the acts charged in the Indictment and, therefore, are not subject to the strictures of Rule 404(b). As outlined below, this evidence is part and parcel of the proof of the charged offenses and will help explain for the jury members what happened and why for a more complete understanding of the Defendant's actions and intent. In the alternative, and out of an abundance of caution, the United States gives notice pursuant to Federal Rule of Evidence 404(b) of the government's intent to offer this evidence as evidence of Defendant's knowledge, intent, plan, state of mind, motive, opportunity, preparation, and lack of mistake/accident.

## I.     PROCEDURAL BACKGROUND

On March 17, 2023, the grand jury charged the Defendant with four counts of making false statements/writings, five counts of concealing/retaining government property and six counts of conversion of government property. (ECF. Doc. 35). Trial is scheduled to commence on December 4, 2023. (ECF Doc. 40).

## II.     FACTS

The facts giving rise to the charges in indictment stem from the retirement of United States Forest Service (USFS) law enforcement officer, Ronald Ostrom (Defendant) in August of 2021. During the Defendant's career with the USFS, he was issued certain government property for use in the course of his official duties as a law enforcement officer and as the Mounted Patrol Coordinator for Region 2 of the USFS in Wyoming. In preparation for the Defendant's last day with the Forest Service, a list was compiled of the government property believed to be in the Defendant's custody and control. Included as part of the Defendant's property were three horses and a mule. The Defendant provided brand inspection paperwork which indicated ownership by the USFS of the livestock. As to the livestock relevant here, there was a blue roan mare called "Roany" purchased by the USFS on August 26, 2014, and a bay gelding called "Reo" purchased by the USFS on August 7, 2013. An "AD-107 Report or Transfer of other Disposition or Construction of Property" was filled out listing the livestock.[1] The AD-107 was signed by the Defendant and his supervisor documenting the return of the stock (Counts One and Two).

The Defendant was instructed to deliver the USFS livestock to a government pasture known as "Sunlight" in Cody, Wyoming. Shortly after the Defendant's retirement, USFS Law Enforcement Officer (LEO) Travis Haworth went to Sunlight pasture to confirm the Defendant

---

[1] Another horse and mule were also listed on the AD-107 however, they were returned and are not at issue here.

had delivered the government's livestock. Upon his arrival at Sunlight pasture, LEO Haworth immediately noticed two horses in the pasture which he did not recognize as USFS livestock. LEO Haworth was familiar with the Defendant's government livestock and specifically with Roany and Reo due to having observed and photographed them in the Sunlight pasture in 2017 and 2018. LEO Haworth believed the gray mare and a dark colored gelding in the Sunlight pasture were not the same Roany and Reo he remembered. (Counts Three and Four) Officer Haworth reported his observations, and an investigation was initiated to determine whether the real Roany and Reo had been taken by the Defendant and replaced with imposter horses. This eventually led to a large amount of evidence indicating the Defendant likely kept and/or converted other government livestock and property over the course of his career.

Historical USFS property inventory lists were checked. The first inventory list with items relevant to the charges in the indictment is dated September 7, 2007, and indicated the Defendant was issued three mules named "Rosy," "Roxy" and "Ruby" and a 1997 Lariat trailer. Rosy and Roxy are the subject of Count Five and the Lariat trailer is the subject of Counts Ten and Eleven:

| | | ITEM | | | | | Registration | | |
|---|---|---|---|---|---|---|---|---|---|
| Date: | | 9/7/2007 Officer: | | | 1690 OSTROM | | | | |
| # | Make | Model | Year | Color | VIN | Number | State | Year |
| | 1 Mule | Molly | 11 | red | Rosy | | | |
| | 1 Mule | Molly | 10 | red | Roxy | | | |
| | 1 Mule | Molly | 8 | red | Ruby | | | |
| | 1 Horse | Mare | 7 | black | Rachael | | | |
| | 1 Horse | Gelding | 18 | pinto | Chief | | | |
| | 1 Horse | Gelding | 10 | pinto | Shoshone | | | |
| | 4 Decker pack | Saddles | 2004 | | | | | |
| | 1 Bob's riding | saddle | | brn | slick fork | | | |
| | 1 Sawtooth riding | saddle | | brn | half seat | | | |
| 1 pr. | kitchen | panniers | | alum | bear resistant | | | |
| 1 pr. | pack | panniers | | alum | bear resistant | | | |
| | 1 Panasonic | DMC-LC43 | 4 | | 6A38802754 | | | |
| | 1 Chevy | | 2500 | 5 | grn | 1GCHK23255F920099 | | |
| | 1 KING | HH | | | DPHX5102X | | | |
| | 1 KING | HH | | | EPH5102X | | | |
| | 1 KING | MOBILE | | | GMH5992R | | | |
| | 1 KING | MOBILE | | | EMH5990A | | | |
| | 1 MARLIN | 1895SS | | BLK | 14054891 | | | |
| | 1 MARLIN | 1895GS | | SS | 96203889 | | | |
| | 1 REMINGTON | 870 | | BLK | W807494M | | | |
| | 1 COLT | AR-15 A-2 | | BLK | LGO026802 | | | |
| | 1 GLOCK | 22 | | BLK | EEZ540 | | | |
| | 1 AUDIOVOX | | | | 307-899-9585 | | | |
| | 1 QUALCOMM | 1600 | | | 254-381-9815 | | | |
| | 1 ROCKWOOD | FOREST RIVER | | WHT | 4X4TRLD292D990796 | | | |
| | 1 LARIAT | 2 PLACE | | BLK | LAR101522 | | | |
| | 1 CIRCLE D | 4 PLACE | 2004 | WHT | 4D3SG282931009872 | | | |
| | 1 POLARIS | 500 | 2000 | GRN | EH500PLE0914698 | | | |
| 10/11/2007 | sandisk | 1GB memory stick | | | | | | |

Next is an inventory from October of 2012 which included the Lariat trailer and four mules--Roxy, Rosy, Ruby and now "Rory":

### PROPERTY INVENTORY

| DATE: 10/2012 | | LEO: Ron OSTROM | | | |
|---|---|---|---|---|---|

| MAKE | MODEL | YEAR | COLOR | VIN#/Serial # | COMMENTS |
|---|---|---|---|---|---|
| GM | K2500Diesel | 2011 | White | 1GC1KVC85BF240058 | 2196 patrol rig |
| Polaris | 500 | UNK | | EH500PLE0914698 | ATV |
| Glock | 22 | | | EEZ54OUS | Duty Issue |
| Colt | AR15A2 | | | IGC026302 | Duty Issue |
| Remington | 870 Shot gun | | | W807494M | Duty Issue |
| Taser | X26 | | | X00-314639 | Duty Issue |
| Game Camera | HC600 | | | N/A | Game Camera |
| Panasonic | Toughbook | | | 0AKYA10398 | Duty Issue |
| Yamaha | RX10MLR | | | JYE8FS0006a001479 | Snowmobile |
| Marlin | 45/70 | | | 14054891 | Duty Issue |
| iridium | | | | 881651473489 | Sat Phone |
| Raptor | RP-1 | | | RP04359 | Radar Unit |
| | | | | | |
| ITT | NEPVS14-17 | | Black | RS 5507121 | NVG |
| Vievu | | | | | wearable camera |
| Port Replicator | CF-VEB311U | | | OKTSA02666 | |
| Motorola | XTS5000 | | | H18KEH9PW7AN | Portable Digital Radio |
| Mule | Molly | | red | | Rosy |
| Mule | Molly | | red | | Roxy |
| Mule | Molly | | red | | Ruby |
| Horse | Mare | | black | | Rachael |
| Horse | Gelding | | black | | |
| Horse | Gelding | | buckskin | | |
| Decker pack | Saddles | | | | |
| Bob's riding | saddle | | brn | | slick fork |
| Mule | Molly | | red | | Rory |
| kitchen | panniers | | alum | | bear resistant |
| pack | panniers | | alum | | bear resistant |

| KING | HH | | | DPHX5102X | |
|---|---|---|---|---|---|
| KING | HH | | | EPH5102X | |
| KING | MOBILE | | | GMH5992R | |
| KING | MOBILE | | | EMH5990A | |
| LARIAT | 2 PLACE | | BLK | LAR101522 | DOUBLE TILT TRAILER |
| CIRCLE D | 4 PLACE | | WHT | 4D3SG282931009872 | GOOSE NECK horsetrailer WCF#4990 |
| Polaris | RMK 800 | | silver | SN1CM8GS3DC749870 | SNOW MACHINE |
| TRITON | 2 PLACE | | SILVER | 4TCSS1125CHV16601 | snow machine trailer |
| Garmin | GPS | | blk | | NUVI |
| Leupold | binoculars | | tan | | |

Pictures of the mules and the Lariat trailer were included as part of the official 2012 inventory:



Lariat 2 place



Ruby - 6



Rosy - 21



Rory - 19



Rory - 5

Next was a livestock only inventory list from February of 2017. This is the first list which refers to Reo and Roany as the Defendant's assigned stock. The list was emailed to the Defendant and only included three of the four mules (Rosy, Roxy and Ruby). The Defendant responded with some additional information as to the ages of some of the animals and made a notation that Ruby was "gone":

**From:** Willems, Mary A -FS
**Sent:** Tuesday, February 21, 2017 4:49 PM
**To:** Ostrom, Ronald -FS <rostrom@fs.fed.us>
**Subject:** Stock List

| # | TYPE | SEX | YEAR | COLOR | NAME |
|---|------|-----|------|-------|------|
| | Mule | Molly | 20 | red | Rosy |
| | Mule | Molly | 19 | red | Roxy |
| | Mule | Molly | 11 | red | Ruby |
| | Horse | Gelding | 20 | pinto | Shoshone |
| | | | | | |

| | Horse | Gelding | | paint | Ruger |
|---|------|---------|---|-------|-------|
| | Horse | Gelding | | grey | Granite |
| | Horse | Gelding | | gray | Ringo |
| | Horse | Gelding | | bay | Reo |
| | Horse | Bell Mare | | gray | Roany |
| | Horse | | | bay | Colter |
| | Horse | | 21 | red | Cody |



In October of 2017, an equipment inventory was sent to the Defendant with the Lariat trailer listed. The Defendant responded via email that he did not have the Lariat trailer:

**From:** Ostrom, Ronald -FS
**To:** Willems, Mary A -FS
**Subject:** RE: Inventory Attached
**Date:** Monday, October 2, 2017 1:43:00 PM
**Attachments:** image001.png
image002.png
image003.png
image004.png

Don't have the 2000 polaris, or the 1997 Lariot

**From:** Willems, Mary A -FS
**Sent:** Tuesday, September 26, 2017 8:07 AM
**To:** Ostrom, Ronald -FS <rostrom@fs.fed.us>
**Subject:** Inventory Attached

| EQUIP # | LAST NAME | PLATE # | VIN/SERIAL NUMBER | MAKE | MODEL | FOREST | ZIP CODE |
|---------|-----------|---------|-------------------|------|-------|--------|----------|
| 3162 | Ostrom | A373931 | 3C6UR5HL5GG303808 | 2016 Dodge | 3/4 ton | Shoshone | |
| 2574 | Ostrom | A363505 | | | 4-place gooseneck horse trailer | Shoshone | |
| AG0001750967 | Ostrom | none | 4XAZN5EA7DAS71967 | 2013 Polaris | 550 cc ATV | Shoshone | |
| none | Ostrom | none | EHS00PLE0914698 | 2000 Polaris | 500 cc ATV | Shoshone | |
| AG0001757063 | Ostrom | none | SN1CM8GS3DC749870 | 2013 Polaris | RMK800 Snowmobile | Shoshone | |
| none | Ostrom | A7499 | LAR101622 | 1997 Lariot | SM Trailer - 2 place tilt, no brakes | Shoshone | |
| | Ostrom | A363462 | 4TCSS1125DHV16601 | 2012 Triton | SM Trailer XT12VR-101 | Shoshone | |

<mark>Here is what I'm showing you have. I'm missing the VIN on the horse trailer and a couple license plate numbers.</mark>



**Mary Willems**
Program Assistant
**Forest Service**
Region 2 - Law Enforcement & Investigations - Northern Zone
p: 605-673-9281
c: 605-673-1670
f: 605-673-9008
mwillems@fs.fed.us
1019 N 5th Street
Custer, SD 57730
www.fs.fed.us
Caring for the land and serving people

In June of 2018, the Forest Service conducted an inventory of stock and equipment. A letter was sent to the Defendant and others in the USFS, which requested a list of all stock in the Defendant's possession, including photographs, by June 22, 2018. In response, the Defendant submitted the following inventory list on June 21, 2018 (Roxy and Rosy were not listed):

| | | | | | |
|---|---|---|---|---|---|
| **REGION 2 MOUNTED PATROL STOCK AND EQUIPMENT INVENTORY** | | | | | |
| **LEO RON OSTROM** | | | | | |
| **AS OF JUNE 2018** | | | | | |
| **TYPE** | **SEX** | **YEAR** | **BIRTH DATE** | **COLOR** | **NAME OR VIN** |
| Horse | Gelding | 10 | | grey | Granite |
| Horse | Gelding | 9 | | gray | Ringo |
| Horse | Gelding | 7 | | bay | Reo |
| Horse | Bell Mare | 5 | | gray | Roany |
| | | | | | |
| Mule | Molly | | 1/1/2006 | sorrel | Remmy |
| | | | | | |
| 2016 Dodge Pickup 3/4 ton WCF#ID3162 | | | A373931 | white | 3C6UR5HL5GG303808 |
| 2013 4-place gooseneck horse trailer WCF#2574 | | | A363505 | white | 4TGG22209D1066467 |
| | | | | | |
| 12/5/2016 | | | | | Stock Training Ball |
| 7/1/2016 | | | | | pack pad, pack saw, hammer |
| 7/1/2016 | | | | | saddlesaw, lead ropes, |
| 7/22/2016 | | | | | feed bags |
| 7/22/2016 | | | | | slicker, bedroll cover |
| 8/5/2016 | | | | | tent |
| 8/1/2016 | | | | | canvas bag |
| 8/1/2016 | | | | | aluminum pannier |
| 5/12/2014 | | | | | blanket |
| 7/28/2016 | | | | | canvas pannier, hobble, scale |

The Defendant sent the photos below of Roany and Reo with his inventory list:




*Roany*                                          *Reo*

The above photo of Reo was later determined not to be Reo and was instead a generic photo of a

bay horse taken from the internet:





On July 17, 2018, a few weeks after receiving the Defendant's above inventory list, the

Defendant's supervisor inquired as to the Defendant's government mules, wondering if they had

been retired. On July 31, 2018, the Defendant replied that he sent an AD-112[2] getting rid of the

horse "Coulter"[3] and the mules previously.

No follow up on this was done until three years later, when, in July of 2020, the Defendant's

supervisors realized the official paperwork on Coulter remained incomplete and Coulter was still

showing up as government property. Inquiries were made and the following email exchange took

place between the Defendant and his supervisors:

**From:** Walters, Nicholas - FS <nicholas.walters@usda.gov>
**Sent:** Wednesday, July 8, 2020 12:14 PM
**To:** Hartley, David B -FS <david.hartley@usda.gov>
**Cc:** Ostrom, Ronald -FS <ronald.ostrom@usda.gov>
**Subject:** RE: AD 112 Coulter[45647].doc

Sounds like this fell through the cracks when it was sent up back in 2017. Do we know who the Horse
was donated to? We recently retired JD and I needed to provide the AD-107 (whom it was
transferred to) and the AD-112 showing he was unserviceable. I am going to assume, this process

may be required for Coulter as well. Once I have who his is donated to, we can move forward with
completing the paperwork.

Thanks .



**Nick Walters**
**Patrol Commander (Acting)**
**Forest Service**
Rocky Mountain Region

c: 720-325-3375
nicholas.walters@usda.gov
2840 Kachina Drive
Pueblo, CO 81008
www.fs.fed.us

Caring for the land and serving people

---

[2] An AD-112 is a "Report of Unserviceable, Lost, Stolen, Damaged or Destroyed Property."
[3] Coulter had injured his leg and was unable to serve as a government horse any longer.

**From:** Hartley, David B -FS <david.hartley@usda.gov>
**Sent:** Wednesday, July 8, 2020 1:49 PM
**To:** Walters, Nicholas - FS <nicholas.walters@usda.gov>
**Cc:** Ostrom, Ronald -FS <ronald.ostrom@usda.gov>
**Subject:** RE: AD 112 Coulter[45647].doc

I do not know who the animal was donated to. Mr. Ostrom can complete that part of the paperwork and submit as well



**David B Hartley**
**Patrol Captain**
**Forest Service**
**Region 2 LawEnforcement &Investigations Northern Zone / Shoshone NF, Big Horn NF, Black Hills NF, Nebraska NF & Grasslands**
p: 307-674-2682
c: 307-683-7060
dbhartley@fs.fed.us
david.hartley@usda.gov
2013 Eastside 2nd Street
Sheridan, WY 82801
www.fs.fed.us

**From:** Walters, Nicholas - FS <nicholas.walters@usda.gov>
**Sent:** Monday, July 13, 2020 1:23:08 PM
**To:** Hartley, David B -FS <david.hartley@usda.gov>
**Cc:** Ostrom, Ronald -FS <ronald.ostrom@usda.gov>
**Subject:** RE: AD 112 Coulter[45647].doc

Ron,

Do you recall who the Horse was donated to?

Thanks.

**From:** Ostrom, Ronald -FS <ronald.ostrom@usda.gov>
**Sent:** Monday, July 13, 2020 1:44 PM
**To:** Walters, Nicholas - FS <nicholas.walters@usda.gov>; Hartley, David B -FS <david.hartley@usda.gov>
**Subject:** Re: AD 112 Coulter[45647].doc

The veterinarian research group from either Montana or Colorado took him for their work on cell regeneration. Been awhile.

Get Outlook for iOS

**From:** Walters, Nicholas - FS <nicholas.walters@usda.gov>
**Sent:** Monday, July 13, 2020 2:25:58 PM
**To:** Ostrom, Ronald -FS <ronald.ostrom@usda.gov>; Hartley, David B -FS <david.hartley@usda.gov>
**Subject:** RE: AD 112 Coulter[45647].doc

Ok.

I know it has been 2-3 years, but in order to get him off of the books, I will need to show who he was

transferred to. This will also assist if we are audited showing what we did with Government property.

I will need you to follow up on this and get me a name of the veterinarian research group and a person willing to sign, saying the horse was donated to them, it will make completing the required paperwork easier. Once I have this information, I can move forward with signatures. Currently his is still showing as government property as the paperwork is not completed.

Thanks.

**From:** Ostrom, Ronald -FS <ronald.ostrom@usda.gov>
**Sent:** Tuesday, July 14, 2020 2:03 PM
**To:** Walters, Nicholas - FS <nicholas.walters@usda.gov>; Hartley, David B -FS <david.hartley@usda.gov>
**Subject:** Re: AD 112 Coulter[45647].doc

The group is Montana Equine Cellular Medicine. It's a group of specialized veterinarians working on Biocellular Regeneration for equines. The vet in Bridger, Mt., Ray Hall was instrumental in starting this to improve research for these types of injuries.

Get Outlook for iOS

| | |
|---|---|
| **From:** | Hartley, David B -FS |
| **To:** | Ostrom, Ronald -FS; Walters, Nicholas - FS |
| **Subject:** | RE: AD 112 Coulter[45647].doc |
| **Date:** | Tuesday, July 14, 2020 3:13:15 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |

Thank you Ron
So it looks like the options are    A: Dr. Ray Hall Signs for the Horse showing receipt of the animal on
a AD112
Or/                                B: There's a brand inspection copy to show the transfer

Pursuant to these emails, the Defendant filled out an AD-107 regarding Coulter which indicated he was transferred to the Montana Equine Research in Bridger, Montana.[4] No mention was made of the mules Roxy and Rosy. On December 21, 2020, the Defendant submitted the completed AD-107 form which purported to have been signed by the Office Manager for Montana Equine Research.

Eventually a search warrant was obtained in March of 2022 for the Defendant's property to search for Roany and Reo and any other government property. During the execution of the search warrant, a gray mare which appeared to be Roany (Counts Eight and Nine) was seized, along with the two mules--Roxy and Rosy. The Lariat trailer with government plates was recovered along with a Haulrite 15' steel flatbed trailer with government plates, bridles and saddle pads, and over 10,000 rounds of ammunition which belonged to the USFS (the ammo is the subject of Count Twelve and Thirteen). Reo and the other two mules, Rory and Ruby, were not located during the March execution of the search warrant.

Law enforcement personnel also discovered some paperwork relevant to the mules, Roxy and Rosy. A brand inspection certificate dated February 8, 2018, (#113671) was located which showed a transfer of ownership of USFS livestock by the Defendant to Bridger Vet Services LLC. Bridger Vet Services LLC, is the clinic where the Defendant's (now ex) girlfriend, Tori Steinmetz-Lewis worked as a veterinarian. The brand inspection noted that proof of ownership was received by the brand inspector from the Defendant, which indicated the current owner of the horse and two mules was the U.S. Department of Agriculture, Forest Service. The Defendant signed the brand inspection as the "agent." The Wyoming Livestock Board researched this brand inspection and

---

[4] The Montana Secretary of State does not show any record of an organization with this name ever existing. Tori Steinmetz-Lewis confirmed that Coulter instead went to her so she could do platelet rich plasma research. The address listed on the AD-107 lists the address as 17 Vet Lane in Bridger Montana, which is the address for Bridger Vet Services, where Tori Steinmetz-Lewis practiced at the time.

located the ownership papers given to the brand inspector by the Defendant. The first was for a bay gelding horse with a star on his face (Form L 08L-E80367) (Coulter) and owned by the USFS; 2) a sorrel molly mule with a star on her face (Form L 83-03L-17427) (Rosy) and owned by the USFS; and, 3) a sorrel molly mule (Form L 83-03L-17428) (Roxy) and owned by the USFS.

During the search for additional paperwork relating to the circumstances of the transfer of Coulter and the mules, the email traffic referred to above, in which the Defendant stated he could not remember who exactly took Coulter. One additional email was discovered, sent by the Defendant on June 1, 2017, to his supervisors with an AD-112 "Report of Unserviceable, Lost, Stolen, Damaged or Destroyed Property" which listed Coulter (but not the mules). In the email, the Defendant stated a brand inspection for Coulter would be done soon. The Defendant's supervisor followed up with the Defendant on July 24, 2017, asking for the brand inspection and did not receive a response. No other paperwork or emails were located regarding the retirement of the mules Roxy and Rosy, despite a thorough records search. The whereabouts of Ruby or Rory are unknown to this day.

Tori Steinmetz-Lewis was shown the AD-107 the Defendant provided to the USFS transferring Coulter to Montana Equine Research and she stated it was signed by her office manager, "Andrea Frost." Andrea Frost was interviewed and reported the signature on the AD-107 was not hers and was fraudulent. Additionally, Ms. Frost stated she was not the office manager at Tori Steinmetz-Lewis' Bridger Clinic and she knew nothing about any transfer of livestock to the Bridger Vet clinic from the USFS.

The investigation continued after the execution of the March search warrant. Additional evidence was discovered which resulted in a second search warrant for the Defendant's property in November of 2022 to look for Reo. This time, Reo was found and seized (Counts Six and

Seven). When Reo was located, the Defendant claimed the horse belonged to his dad and was branded with a "circle JK" on his left shoulder. The Defendant claimed the "circle JK" brand belonged to his dad however it was later learned this brand is not registered. In Wyoming, it is unlawful to brand livestock with an unregistered brand. The Defendant further stated he did not have any ownership papers for the horse because the horse was born on the property.[5] The Defendant told law enforcement that not only did he brand the horse with circle JK brand on the left shoulder, he also branded the horse on his right shoulder with a "flying O" (Defendant's registered brand) and branded the horse's left hip with a "6 bar J" brand (registered Ostrom family brand). Because the government's horse, Reo, also had a brand on his left shoulder—a "reverse D quarter circle"--the hair on his shoulder was shaved so the brand inspector could examine it. The brand inspector compared the brand on the questioned horse's shoulder to a photo of Reo's original brand obtained from photos taken of Reo on other occasions. After viewing the current state of the left shoulder brand the brand inspector determined the original brand (reverse D quarter circle) had been altered with the circle JK brand.

---

[5] Under Wyoming law, brand inspection paperwork is not required for "home raised" animals that do not leave their county and are never sold.



Altering a brand is unlawful in the State of Wyoming. Additional markings known to be unique to Reo were observed on the questioned horse and the brand inspector ultimately determined the horse found at the Defendant's property was in fact USFS Reo and he was taken into Forest Service custody. It was later determined the USFS brand on Reo's left hip had also been altered by branding a 6 bar J over the top of it.

   

Additional investigation was conducted to determine where the imposter Roany came from. The Montana Livestock Division located a brand inspection indicating a gray mare was purchased by Tori Steinmetz-Lewis in Montana on June 28, 2019. Tori Steinmetz-Lewis claimed the mare was purchased for her as a gift from the Defendant. After she and the Defendant brought the mare back to Wyoming, Tori Steinmetz-Lewis never saw the mare again. Tori Steinmetz-Lewis admitted the mare the Defendant turned in as Roany at his retirement was likely the mare they bought in Montana in June of 2019. A previous owner of the Montana mare (now known as Lulu) was further able to positively identify the mare. The date of the purchase of the Montana mare— June 28, 2019—is important because it immediately precedes a 45-day suspension imposed on the Defendant for conduct which is not relevant here. During his suspension, the Defendant was required to turn in his government livestock to the Sunlight pasture.[6] Statements made by the Defendant during the execution of the first search warrant in March regarding the missing horses, indicate the Defendant may have swapped the gray mare for Roany at that time as well, indicating the Defendant was scheming and laying plans to  keep Roany as his own when he retired. This belief is further bolstered by evidence received from the Defendant's government stock shoer who reported that the Defendant began to use a different gray mare as his bell mare only a year or two before he retired. The reason for the suspension is not relevant to this case, only the fact that it occurred and made the Defendant upset is what the Government intends to present at trial.

The previous owner of the dark colored buckskin posing as Reo was also located. A Wyoming Brand Inspection was discovered which transferred the dark buckskin gelding to the Defendant on December 19, 2020, approximately 8 months before the Defendant retired. The

---

[6] The official dates of the suspension were July 21, 2019, through September 4, 2019. The suspension was later overturned and the Defendant was given back pay for the time he was suspended. The date of the suspension and the fact that it was imposed still remains important to show the Defendant's state of mind and intent.

previous owner positively identified the dark buckskin gelding as the horse she sold to the Defendant.

### III.   LEGAL ANALYSIS

### A.  <u>The Proposed Evidence Is Not 404(b) Evidence, but Is Inextricably Intertwined</u>

Evidence of other criminal conduct/activity is admissible "when those facts come in as *res gestae*—as part and parcel of the proof of the offense charged in the indictment" as well as when it "provides the context for the crime, is necessary to a full presentation of the case, or is appropriate in order to complete the story of the crime on trial by proving its immediate context or the *res gestae*." *United States v. Kimball*, 73 F.3d 269, 272 (10th Cir. 1995) (*citing and quoting United States v. Gano,* 560 F.2d 990, 993 (10th Cir. 1977); and *United States v. Masters*, 622 F.2d 83, 86 (4th Cir.1980)).  This type of evidence is often called "intrinsic evidence" and includes uncharged acts that are "part of the scheme for which the defendant is being prosecuted ... or if it was 'inextricably intertwined' with the charged crime such that a witness' testimony would have been confusing and incomplete without mention of the prior act." *United States v. Record,* 873 F.2d 1363, 1372 n. 5 (10th Cir.1989) (*quotations and citations omitted*).

Evidence is "inextricably intertwined" with the charged offense if it forms "an integral and natural part of the witness' account of the circumstances surrounding the offense for which the defendant was indicted." *United States v. Johnson*, 42 F.3d 1312, 1316 (10th Cir.1994) (quotation and alteration omitted).  Although intrinsic evidence is "not always separated by a bright line" from admissible evidence under Fed. R. Evid. 404(b), they are in fact distinct and separate, and intrinsic evidence does not fall within or require analysis under Rule 404(b).  *See Kimball,* 73 F.3d at 272; *United States v. Avalos*, 506 F.3d 972, 975–76 (10th Cir.2007).  Simply put, the parameters

of Rule 404(b) do not apply to intrinsic evidence. *See United States v. Johnson*, 42 F.3d 1312, 1316 (10th Cir.1994).

Here, the specifically charged acts in the indictment are as follows:

- Ct 1: false material writing as to Reo

- Ct. 2: false material writing as to Roany

- Ct. 3: false representation by turning in imposter Roany

- Ct. 4: false representation by turning in imposter Reo

- Ct. 5: Concealing and retaining Roxy and Rosy

- Ct. 6: Stealing/Converting Reo

- Ct. 7: Concealing Reo

- Ct. 8: Stealing/Converting Roany

- Ct. 9: Concealing Roany

- Ct. 10: Stealing/Converting Lariat Trailer

- Ct. 11: Concealing Lariat trailer

- Ct. 12: Stealing/Converting Ammunition

- Ct. 13: Concealing Ammunition

- Ct. 14: Stealing/Converting Packing Tent (not recovered)

- Ct. 15: Stealing/Converting panniers, hooks and hobbles (not recovered)

The acts which the government believes are extrinsic to the charges are as follows:

- The disappearance of the mules Ruby and Rory

- The phony inventory photo of Reo

- The numerous violations of the livestock branding laws

- The various misrepresentations regarding the transfer of Coulter

- The forgery of the office manager's signature on the AD-107
- The discovery of additional government property at his residence during the March search warrant but which was not charged (the Haulrite 15' steel flatbed trailer with government plates and the bridles and saddle pads
- The 45 day suspension from the USFS in July/August of 2019

Here, the intrinsic nature of the events and circumstances surrounding the Defendant's other uncharged conduct is apparent upon review of the relevant facts. Evidence of the disappearance of the mules Ruby and Rory, the phony inventory photo of Reo, the numerous violations of the livestock branding laws, the misrepresentations he told about the transfer of Coulter to his girlfriend, the forgery of the office manager's signature on the AD-107, the discovery of additional government property at his residence during the March search warrant and the fact that he was suspended for 45 days in July/August of 2019[7] is all *res gestae* to the case against the Defendant, making it admissible against him without reference to Fed. R. Evid. 404(b). "While Rule 404(b) precludes evidence of 'other crimes, wrongs or acts,' it does not apply to testimony offered as direct evidence of charged crimes." *United States v. Portillo-Quezada*, 469 F.3d 1345, 1353 (10th Cir. 2006). "Rule 404(b) only applies to evidence of acts extrinsic to the charged crime." *United States v. Lambert*, 995 F.2d 1006, 1007 (10th Cir. 1993) (quotations omitted).

Based on the above facts, the Defendant's additional bad acts relating to the government livestock entrusted to him are part and parcel of the underlying offenses. The evidence will tend to show Defendant became disgruntled with the USFS and felt under appreciated. As the years went by, the mule named Rory dropped off the inventory list and no one questioned it. Then the

---

[7] Again, only the fact of the suspension will be offered, not the conduct underlying it.

mule named Ruby dropped off the inventory list and again, no one questioned it. When Roxy and

Rosy dropped off the list, the Defendant's supervisor wondered where they went, but it was not

followed up on in any meaningful way. This left the Defendant feeling free to transfer Roxy and

Rosy to his girlfriend. The brand inspector did not blink an eye when he turned over paperwork

clearly indicating Roxy and Rosy belonged to the USFS. People trusted him. When the Defendant

was asked to officially account for the horse Coulter, he invented a business name and forged the

office manager's signature on the required form. The Defendant grew bolder and bolder. The

Defendant submitted a photo pulled off the internet of a bay horse and represented it as Reo to see

if anyone was paying attention. Nobody was. He took his deception a step further and bought the

gray mare in Montana to stand in as Roany while he served his suspension, testing the water to see

if anybody would notice. Nobody did. After successfully replacing Roany during his suspension,

the Defendant decided to buy the dark buckskin gelding to replace Reo, again, assuming no one

would notice. And, just in case someone did, the Defendant branded over the top of Reo's official

brands in an attempt to make them unrecognizable. All of this information will be need to add

context to the Defendant's admissions during the first search warrant in which he claimed the

horses he turned in at his retirement were the same horses he turned in during his suspension in

2019.

The government seeks to introduce all of this intrinsic evidence to tell the whole story, the

whole scheme, which will provide evidence of intent, motive, state of mind, lack of mistake and

show pattern of behavior on the Defendant's part. Accordingly, the United States believes all the

other act information is admissible simply as part of the complete story and is providing notice to

the Defendant of its intent to present such information at trial.

*Relevance & Prejudice*

Although intrinsic evidence does not fall within the parameters and analysis of Rule 404(b) (*See Kimball*, 73 F.3d at 272; *United States v. Avalos*, 506 F.3d 972, 975–76 (10th Cir.2007); *United States v. Johnson,* 42 F.3d 1312, 1316 (10th Cir.1994)) the rules of relevance and prejudice still apply. Evidence of the Defendant's involvement in other bad acts is, as discussed above, relevant to the charged offenses.[8]

Federal Rules of Evidence, Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by…unfair prejudice."  However, because in any criminal proceeding relevant evidence will always be prejudicial, only evidence that is unfairly and substantially prejudicial is precluded.  *See generally United States v. Naranjo*, 710 F.2d 1465, 1469 (10th Cir. 1983); *Deters v. Equifax Credit Info. Services,* 202 F.3d 1262, 1274 (10th Cir. 2000). "In performing the 403 balancing, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Deters,* 1274.

Here, the evidence laid out in detail above will not unfairly and substantially prejudice the jury. The evidence shows the Defendant was engaged in a pattern of conduct, testing the waters gradually to see what he could get away with--turns out, quite a lot. This empowered the Defendant and he became bolder and bolder and someone finally noticed. The build up to this outrageous conduct by a sworn law enforcement officer explains and puts into context the Defendant's behavior. It sheds light on why he thought he would be able to get away with this. The proposed evidence is probative of the Defendant's state of mind and outweighs any unfair prejudice to the

---

[8] The United States recognizes that based upon the nature of this evidence a limiting instruction may be necessary so as to properly inform the jury of the purpose for the admission of this evidence, and to caution against any improper use of this information.

Defendant.  The evidence laid out in detail above will not mislead or confuse the jury or waste the court's time and should be admitted.

**B.  The Evidence is Admissible Under Fed. R. Evid. 404(b) to Demonstrate Motive, Knowledge, Intent, Pattern of Behavior, Lack of Accident or Mistake**

The identified evidence is also admissible and would be properly admitted under Fed. R. Evid. 404(b). Evidence of crimes, wrongs, or other acts is prohibited under the Federal Rules of Evidence when used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Such evidence is permitted, however, "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  To determine whether Rule 404(b) evidence is properly admitted, the Court must look to the four-part test from *Huddleston v. United States*, 485 U.S. 681 (1988):

(1)     The evidence must be offered for a proper purpose under Rule 404(b);

(2)     The evidence must be relevant under Rule 401;

(3)     The probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice under Rule 403; and

(4)     The district court, upon request, must have instructed the jury pursuant to Rule 105 to consider the evidence only for the purpose for which it was admitted.

*See United States v. Rodella*, 804 F.3d 1317, 1333 (10th Cir. 2015).

**1.  The evidence is offered for a proper purpose.**

The first *Huddleston* factor requires the evidence be offered for a proper purpose under Rule 404(b). "Evidence is offered for a proper purpose if it is utilized for any of the 'other purposes' enumerated in Rule 404(b)," *United States v. Davis*, 636 F.3d 1281, 1298 (10th Cir. 2011), and that enumerated list "is illustrative, not exhaustive," *United States v. Brooks*, 736 F.3d

921, 939 (10th Cir. 2013) (*citing United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001)). "Rule 404(b) is considered to be an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." *Brooks*, 736 F.3d at 939.

Under the first prong of *Huddleston,* the evidence laid out above is offered here for a proper purpose - to establish plan, intent, motive, identity, preparation, lack of mistake, and knowledge. *See United States v. Ramirez*, 63 F.3d 937, 943 (10th Cir. 1995) (listing cases). At trial, the government believes the Defendant may claim all of this was an accident and entirely unintentional. In fact, the Defendant's intent may be the only seriously contested issue at trial. Any information which is indicative of the Defendant's state of mind and intent is relevant. The Defendant engaged in a pattern of behavior over his career as a law enforcement officer of converting government property to his own personal use. He abused his position of trust. The other act evidence will demonstrate the lack of accident regarding any claim that he "forgot" he had government property or that he was "confused" as to which animals were which.

The other act evidence shows lack of mistake or accident. As explained above, additional bad acts engaged in by the Defendant paint a striking picture of abuse. According to Wigmore's theory of improbability, "[s]imilar results do not usually occur through abnormal causes; and the recurrence of a similar result tends to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish the presence of the normal, i.e. criminal, intent accompanying such an act. . . ." Edward J. Imwinkelried, Uncharged Misconduct Evid. § 5:6 (updated Jan. 2020). Said another way, the similarity of all the conduct engaged in by the Defendant lessens the likelihood that the charged conduct was undertaken by accident or mistake. McCormick on Evid. § 190.4 (8th ed.) (updated Jan. 2020); 1 Uncharged Misconduct Evid. § 5:6 (updated Jan. 2020). Thus, the pattern of behavior engaged in by the Defendant make claims by

him that he did not remember he had the items or was confused makes all the bad acts relevant and highly probative to any possible claim that the charged conduct was engaged in unwittingly.

The testimony regarding the altering of the brands on Reo to conceal him further demonstrates the Defendant's bad intent and motive—that is to avoid being caught with the government's horse.

These purposes are specifically contemplated by Rule 404(b), and are, therefore, plainly proper. *See* Fed. R. Evid. 404(b)(2) (listing "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"). The first *Huddleston* factor is thus satisfied.

## 2. The evidence is relevant under Rule 401.

The second *Huddleston* factor requires that the evidence be relevant under Rule 401. Evidence is relevant if: (1) "it has any tendency to make a fact more or less probable than it would be without the evidence;" and (2) "the fact is of consequence in determining the action." Fed. R. Evid. 401. In other words, "[r]elevant evidence tends to make a necessary element of an offense more or less probable." *Davis*, 636 F.3d at 1298.

Evidence's relevance cannot "depend on a defendant likely acting in conformity with an alleged character trait" or require the jury to draw a "chain of inferences dependent upon [a] conclusion" about the defendant's character. *See United States v. Commanche*, 577 F.3d 1261, 1267, 1269 (10th Cir. 2009). But all this is "not to say that other-act evidence must be excluded whenever a propensity inference can be drawn; rather, Rule 404(b) excludes the evidence if its relevance to 'another [proper] purpose' is established only through the forbidden propensity inference." *United States v. Rodella*, 804 F.3d 1317, 1333 (10th Cir. 2015).

Evidence remains admissible even if it has the potential "impermissible side effect of allowing the jury to infer criminal propensity," so long as the jury "[i]s not *required* to make any such inferences in order to also" find willfulness or intent, or any of the other proper purposes allowed under Rule 404(b).  *See Henthorn*, 864 F.3d 1241, 1251-52, quoting *Rodella,* 804 F.3d at 1333-34 (emphasis in original). The court in *Henthorn* explained this nuance through *United States v. Moran*, 503 F.3d 1135 (10th Cir. 2007).  *Henthorn*, 864 F.3d at 1252.  In *Moran*, the district court presiding over defendant Moran's trial for being a felon in possession of a firearm allowed the government to present evidence of Moran's prior felon-in-possession conviction.  *Moran,* 503 F.3d at 1138-39.  While the use of Moran's prior conviction to help prove the only challenged element of the charged offense (*i.e.*, that Moran "knowingly possessed" the firearm) "involve[d] a kind of propensity inference (*i.e.*, because he knowingly possessed a firearm in the past, he knowingly possessed the firearm in the present case)," the court explained that the inference "did not require a jury to first draw the forbidden general inference of bad character or criminal disposition."  *Id.* at 1145.  Instead, the inference was "specific" and "rest[ed] on a logic of improbability that recognizes that a prior act involving the same knowledge decreases the likelihood that the defendant lacked the requisite knowledge in committing the charged offense."  *Id.*

As to relevance, of course the Defendant has pled not guilty and denies he stole the government's property. As stated earlier, the government expects the Defendant will claim this was an accident or that he did not understand what he was doing was wrong. The pattern of conduct demonstrated above—that is, slowly and methodically testing the system to see who would notice his property was disappearing--is clearly relevant to the determinations to be made by the jury. The evidence of the Defendant's attempts to cover up or destroy Reo's brands is highly relevant

of intent. The government is also required to prove, as an element of the charges in the Indictment that the Defendant knowingly and intentionally made false statements and knowingly intended to convert the government's property to his own use. The other act evidence is extremely relevant to the jury determinations as to the Defendant's intent and knowledge.

Indeed, the Defendant's additional bad acts which are not charged meet all these factors. The probative value of this evidence is not substantially outweighed by the danger of unfair prejudice. Of course, some danger for prejudice will always arise merely from disclosing an uncharged bad act to a jury, but that danger must substantially outweigh the probative value of the proffered evidence. In this case, the probative value of the uncharged bad acts far outweighs any danger of prejudice. Because the proffered evidence is offered for the proper purposes under Rule 404(b) and is relevant, the second *Huddleston* factor is met.

3. **The probative value of the evidence is not substantially outweighed by its potential for unfair prejudice under Rule 403.**

The third *Huddleston* factor requires that the evidence's probative value not be substantially outweighed by its potential for unfair prejudice. Fed. R. Evid. 403 directs that a court may exclude evidence if its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The exclusion of evidence under Rule 403 "is an extraordinary remedy and should be used sparingly." *Brooks*, 736 F.3d at 940 (quoting *United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001)).

"Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant *wholly apart* from its judgment as to his guilt or innocence of the crime charged." *Henthorn*, 864 F.3d at 1256, quoting *United States v. Mackay*, 715 F.3d 807, 840 (10th Cir. 2013)

(citation omitted) (emphasis in original).  "In engaging in the requisite balancing," courts "give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value."  *Id.,* quoting *United States v. Cerno*, 529 F.3d 926, 935 (10th Cir. 2008).  And "it is not enough that the risk of unfair prejudice be greater than the probative value of the evidence; the danger of that prejudice must substantially outweigh the evidence's probative value."  *Id.*  "The trial court has broad discretion to determine whether prejudice inherent in otherwise relevant evidence outweighs its probative value."  *Id.*

Presentation of the Defendant's conversion/theft of other government property over the course of his career and his attempts to cover up his crimes does not call for the jury to convict the Defendant on an improper basis. Instead it is highly probative to the charged conduct. Therefore, the probative value is not substantially outweighed by the danger of unfair prejudice and the third *Huddleston* factor is satisfied.

4.    **The district court will instruct the jury pursuant to Rule 105 to consider the evidence only for the purpose for which it was admitted.**

The fourth and final *Huddleston* factor requires the district court, upon request, to instruct the jury to consider the evidence only for the purpose for which it was admitted.  "If a court admits evidence that is admissible ... for a purpose – but not ... for another purpose – the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly." Fed. R. Evid. 105.  For example, "[a] limiting instruction cautions the jury that the Rule 404(b) evidence should be considered only for the purposes for which it was admitted and not as evidence of the defendant's character or propensity to commit an offense."  *Davis*, 636 F.3d at 1298.  It is the common practice of this court to include such a limiting instruction, and "absent a showing to the contrary, there is a presumption that jurors will conscientiously follow the trial court's instructions." *Brooks*, 736 F.3d at 941. The final *Huddleston* factor can be met.

## IV.    CONCLUSION

Here, the Defendant's possession of additional government property, the disappearance of the mules Rory and Ruby, the misbranding and brand tampering on Reo, the fraudulent signature on the AD-107 involving Coulter, the misrepresentations to his supervisor as to who took Coulter, and his 2019 suspension is inextricably intertwined with the crimes charged, provides the context for the crimes and is necessary to understand the context of the Defendant's actions. Alternatively, the proffered evidence demonstrates the Defendant's knowledge, motive, plan, opportunity, intent, preparation and lack of mistake/accident and is admissible under the accepted principles set forth in Rule 404(b).  Having notified the Court and the Defendant of the proposed other act evidence, explained its proper purpose, its relevance, and the absence of unfair prejudice, the United States requests the Court find the evidence is admissible at trial under Fed. R. Evid. 403 or 404(b).

DATED this 20th day of November, 2023.

NICHOLAS VASSALLO
United States Attorney

By:    */s/Michael J. Elmore*
MICHAEL J. ELMORE
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of November, 2023, the foregoing was electronically

filed and consequently served on defense counsel.

*/s/Mikala Dawson*
For the United States Attorney's Office